UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

| | |
|---|---|
| THE UNIVERSITY OF IOWA ENERGY COLLABORATIVE LLC, <br><br>            Plaintiff, <br><br> v. <br><br> THE UNIVERSITY OF IOWA, <br><br>            Defendant. | No. 3:23–cv–0006-_____ <br><br><br><br> **COMPLAINT** |

Plaintiff, the University of Iowa Energy Collaborative LLC ("UIEC"), for its Complaint against the University of Iowa (the "University"), alleges as follows:

## <u>NATURE OF THE ACTION</u>

1.      This is an action seeking to enforce UIEC's contractual rights under an agreement where the University accepted an upfront payment of $1.165 billion from UIEC in exchange for the concession of the University's utility system. That upfront payment, which UIEC made under the terms of the parties' Long-Term Lease and Concession Agreement for the University of Iowa Utility System (the "Concession Agreement"), enabled the University to pay off $153 million in utility bond debt while adding nearly one billion dollars to its endowment.[1]

2.      Specifically, in 2019, the University decided to pursue a public-private partnership for the operation and improvement of its utility system. The University sought the deal for the

---

[1]     Capitalized terms not defined in this Complaint have the meanings assigned to them in the Concession Agreement.

express purpose of obtaining a substantial upfront payment from the private sector, which the University would use to pay down debt and fund a sizable endowment.

3.      In December 2019, after a competitive bidding process, the University identified UIEC as the best candidate for that partnership, and the parties executed the Concession Agreement, which has a term of 50 years.

4.      After the deal closed, UIEC, as promised, made the $1.165 billion upfront payment to the University, and assumed its role as the concessionaire responsible for operating, maintaining, and upgrading the University's utility system and infrastructure.

5.      Now, however, while UIEC continues to discharge all its obligations under the Concession Agreement, the University is breaching its obligations under the Agreement. These breaches include, without limitation:

- wrongfully refusing to make payments that are due and owing;

- wrongfully rescinding approvals for repairs to the utility system, notwithstanding its prior commitments to the contrary; and

- wrongfully refusing to file claims for casualty insurance coverage.

On top of this, the University has claimed an entitlement to payment for alleged "unplanned" utility outages, even though the University's representatives participated in the very meetings and discussions *planning* for those events.

6.      UIEC brings this action to hold the University to its contract.

## THE PARTIES

7.      Plaintiff UIEC is a Delaware limited liability company with its principal place of business in Iowa City, Iowa. UIEC is ultimately owned through other unincorporated entities by: (i) Meridiam Infrastructure North America Corporation ("Meridiam"), a Delaware corporation

with its principal place of business in New York, which ultimately owns 50% of UIEC's Class A units; (ii) ENGIE North America Inc. ("Engie"), a Delaware corporation with its principal place of business in Texas, which ultimately owns 50% of UIEC's Class A units; (iii) Hannon Armstrong Sustainable Infrastructure Capital, Inc. ("Hannon Armstrong"), a Maryland corporation with its principal place of business in Maryland, which ultimately owns 98% of UIEC's Class B units; and (iv) and individuals who do not reside in, nor are citizens of, the State of Iowa, who ultimately own the remaining 2% of UIEC's Class B units.

8.      Defendant, the University, is a public research university with its principal place of business in Iowa City, Iowa.

## JURISDICTION AND VENUE

9.      This Court has general personal jurisdiction over the University because it is an entity formed under the laws of the State of Iowa and has its principal place of business in the State of Iowa.

10.     This Court has specific personal jurisdiction over the University because UIEC's claims arise from business transacted among the parties within the State of Iowa.

11.     This Court has subject matter jurisdiction over this case based on diversity of citizenship because the matter in controversy exceeds $75,000 (exclusive of interest and costs) and is between citizens of different States. 28 U.S.C. § 1332(a)(1).

12.     Venue is proper in this District because: (i) the University resides in this District and (ii) a substantial part of the events giving rise to UIEC's claims occurred in this District. 28 U.S.C. §§ 1391(b)(1), (2).

## FACTUAL ALLEGATIONS

***The University Selects UIEC as the Concessionaire for its Utility System***

13.     In February 2019, the University began exploring the possibility for a public-private partnership ("P3") concession for its on-campus utility system, under which a private utility operator would take over the operation and maintenance of its utility system. In addition, this would permit the University to pursue a number of important objectives, including weaning the University off coal.

14.     P3 concessions are a commonly used model for developing public infrastructure. P3 concessions typically involve a public entity seeking investment and expertise from the private sector in connection with the development or management of facilities or systems that provide a public service; a concessionaire that contracts with the public entity to act as developer of the facilities or systems; an operator that contracts with the concessionaire to run the facilities or systems; and a group of banks that finance the deal. For a public entity like the University, P3 deals of this sort are attractive because they can provide sizable, upfront investment from the private sector that the public entity can use to pay down its debts and plan for the future.

15.     When the University announced its plans to pursue a P3 deal for its utility system, it stated publicly that the upfront payment it expected to receive would be placed into an endowment, and that the annual proceeds realized from the endowment would be invested in the core missions of the University (teaching, research, and scholarship), as well as in the implementation of the University's broader strategic vision.

16.     Engie, Meridiam and Hannon Armstrong formed UIEC to pursue the concession. As is common in such consortiums, Engie brought specific expertise in operations and

construction, and the parties communicated to the University at various times UIEC's intent to engage Engie to provide operations, maintenance and capital project management services.

17.     By July 2019, UIEC was on the University's shortlist to act as concessionaire under the P3 deal.

18.     The University then solicited bids for the P3 deal, and in October 2019, UIEC's consortium and a number of other bidders submitted binding bids for the project.

19.     In early December 2019, after the competitive bidding process was complete, the University selected UIEC to act as concessionaire for its utility system because the University considered UIEC to be the best option for the project. On December 10, 2019, the Board of Regents for the State of Iowa approved the selection, and the parties entered into the Concession Agreement.

20.     The deal closed in March 2020, with UIEC making a $1.165 billion payment to the University in exchange for the University's agreement to select it as the concessionaire for the 50-year-long concession period. The University used $153 million of the proceeds to pay off its existing utility system bonds, $13 million of the proceeds to pay consulting fees, with the remaining $999 million reserved for its endowment.

21.     On information and belief, the University expects the endowment and its earnings to allow for $3 billion in disbursements during the 50-year term of the Concession Agreement, and to provide a revenue source to help it fund its strategic priorities, including efforts to improve outcomes for students such as graduation and retention rates.

22.     UIEC was enthused to partner with the University, and remains fully committed to helping the University meet its sustainability goals and bring its utility system into the 21st Century.

*The Concession Agreement: Key Provisions*

23.     The Concession Agreement is the result of extensive negotiations between the parties, who were represented by outside counsel and financial advisors with substantial experience in P3 deals throughout those negotiations. The contractual provisions were so carefully negotiated and drafted that the University's President likened the process to "writing the U.S. Constitution."

24.     When the University executed the Concession Agreement, it acknowledged, as it must, that it "has substantial business experience and is fully acquainted with the provisions of th[e] Agreement." Concession Agreement § 20.2. The University further acknowledged that the provisions of the Concession Agreement were "fully negotiated," and that "no provision of th[e] [Concession] Agreement shall be construed in favor of any Party or against any Party by reason of such provision of th[e] Agreement having been drafted on behalf of one Party rather than the other." *Id.*

25.     While the Concession Agreement for this billion-dollar transaction is by necessity highly detailed, the core legal principles and contractual provisions governing this dispute are straightforward. Under the Concession Agreement, UIEC is responsible for operating and maintaining the University's Utility System during the Concession Agreement's 50-year Term, including making Capital Improvements. Concession Agreement §§ 2.1(c)(ii)(A), 3.2, 4.1. As contemplated by the Concession Agreement, UIEC discharges certain of its obligations through an operator, ENGIE Generation North America LLC (the "Operator"), whose rights and responsibilities are defined in a separate Operations and Maintenance Agreement with UIEC. The University approved the appointment of the Operator and is aware of the terms of the Operations and Maintenance Agreement between UIEC and the Operator.

26.     In return for the services performed by UIEC and its Operator, the University agreed that UIEC "shall, at all times during the Term, be entitled . . . to the rights and privileges granted to [it under the Concession Agreement]." Concession Agreement § 3.1(a). This includes the right to payment by the University of an annual Utility Fee, which is designed to cover UIEC's capital and operating costs. *Id.* §§ 2.1(c)(ii)(B), 7.1.

27.     The Utility Fee is calculated under a formula set forth in Schedule 5 to the Concession Agreement. Concession Agreement § 7.1, Schedule 5. The Utility Fee is comprised of a variety of components, including: (i) an annual Fixed Fee of $35 million (which increases by 1.5% per year beginning in 2025); (ii) a component that allows UIEC to recover capital invested in Capital Improvements over time; (iii) the Capped O[perations] & M[aintenance] Index, which is essentially a rolling three-year average of UIEC's Capped O&M Costs; and (iv) certain Uncapped O&M Costs. *Id.* Schedule 5. As relevant here, UIEC's Capped O&M Costs include UIEC employee compensation, certain general and administrative expenses, UIEC's payments to the Operator to operate the Utility System, and costs associated with maintaining UIEC's credit rating. *Id.* § 1.1 (definition of "Capped O&M Costs" items (ii), (xix), (xviii), (xxiii)).

28.     The Concession Agreement has a 50-year Term, so it naturally contemplates certain key things that may happen over the next half-century, including future Capital Improvements. Concession Agreement § 4.1. The Concession Agreement sets forth an approvals process for Capital Improvements, *id.* § 4.3, and if a proposed Capital Improvement is approved by the University (a "New Approved Capital Improvement"), the costs associated with that New Approved Capital Improvement are paid by the University over time as part of the Capital Recovery Amount component of the Utility Fee, *id.* § 4.3(e), Schedule 5.

29.     When UIEC seeks approval for a Capital Improvement, it works with its Operator to submit a detailed plan for the Capital Improvement, including a description of various anticipated costs and expected forecasts. Concession Agreement § 4.3(c). Such costs expressly include "any fee or charge payable to the Operator in connection with such Capital Improvement . . . ." *Id.* § 4.3(H).

30.     The Concession Agreement also requires the University to maintain All Risk Property Insurance for the Utility System, Concession Agreement § 13.2(c), and, after receipt of notice, to make all such claims against the policy that it "reasonably believes are appropriate," *id.* § 13.4(b). This requires the University to seek insurance coverage for property damage events.

31.     Finally, in any utility system, there is sometimes a need to shut down a portion of the system for a variety of reasons, including maintenance to the system, corrections or improvements of the operations of the system, and Capital Improvements. The Concession Agreement therefore provides UIEC with the right to propose, and schedule in consultation with the Facilities Management Group at the University, outages whenever it "reasonably believes that such a shutdown will avoid additional costs in excess of the costs of such shutdown or lengthier shutdowns of the Utility System or a portion thereof later." Concession Agreement § 3.2(g).

***The University Breaches the Concession Agreement***

32.     For nearly three years now, UIEC, individually and through its Operator, has performed as promised and has discharged all of its legal obligations under the Concession Agreement. The University, by contrast, has refused to recognize or perform its contractual obligations.

### The Utility Fee

33.     Issues began to emerge when the parties were working to calculate the Utility Fee owed to UIEC for Fiscal Year 2021, when the University—with its billion dollars now in hand—began searching for ways to reduce its payment obligations to UIEC and chip away at UIEC's contractual rights.

34.     UIEC has tried to help the University understand that its position is unsupportable, but after extensive discussions and exchanges of correspondence, the University has wrongfully refused to pay amounts clearly due. Specifically, the University has improperly refused to pay certain categories of costs included in the definition of "Capped O&M Costs" and owed to UIEC as part of the Utility Fee.

35.     *The Operator Fee.* Under its Operations and Maintenance Agreement with the Operator, UIEC owes a $1.5 million annual fee to the Operator (which amount is escalated annually). This fee was negotiated with the Operator at arm's length, and is in line with market standards.

36.     The University knew about this Operator Fee before it accepted UIEC's winning bid for the P3 concession. UIEC's response to the University's request for proposal for the P3 deal expressly stated that the Operator would be paid a $1.5 million fee for the "day-to-day operation and maintenance of the Utility System[.]"

37.     The University is required to compensate UIEC for the $1.5 million Operator Fee under the plain terms of the Concession Agreement. The preamble to the list of specified Capped O&M Costs in the Concession Agreement unambiguously provides that such costs "shall include payments due and payable by the Concessionaire to the Operator." Concession Agreement § 1.1 (definition of "Capped O&M Costs"). "Capped O&M Costs" also expressly include "payments to

the Operator pursuant to the agreement between the Concessionaire and the Operator to operate the Utility System pursuant to this [Concession] Agreement." Concession Agreement § 1.1 (definition of "Capped O&M Costs," item (xix)). The University refuses to acknowledge these provisions, and has instead made the baseless claim that the Operator Fee "is not encompassed in one of the listed categories in the definition of Capped O&M Costs and therefore is not an allowable Capped O&M Cost."

38.     Notwithstanding the University's willful blindness, the Concession Agreement is clear: If UIEC has to make a payment to the Operator in exchange for the Operator's operation of the Utility System, then that payment is included within the Capped O&M Costs and is therefore a component part of the calculation of the Utility Fee. The University's refusal to include this cost in the Utility Fee is thus a direct breach of the Concession Agreement.

39.     *UIEC Executive Compensation; General and Administrative Expenses.* Capped O&M Costs also include "the professional expenses, salaries, employee benefits and bonuses paid or granted to employees and contractors of the Concessionaire or the Operator to perform any of the Utility System Operations." Concession Agreement § 1.1 (definition of "Capped O&M Costs," item (ii)).

40.     UIEC's CEO and CFO are officers under UIEC's control who can be terminated at any time. The CEO and CFO are responsible for the day-to-day management of the Utility System, and the compensation paid to them is for the services they provide in managing and taking action relating to the Utility System. Their compensation packages, totaling approximately $600,000 in 2020 and escalating annually, were negotiated at arm's length and are in line with market standards. The expenses, salaries, benefits and bonuses for UIEC's CEO and CFO must therefore

be included within Capped O&M Costs and, by extension, the Utility Fee. But the University wrongfully refuses to include these costs in the Utility Fee as well.

41.    These executive compensation costs are also recoverable and covered under another, independent item included within Capped O&M Costs. Item (xviii) provides that the following costs are recoverable: "other selling, general and administrative expenses but only to the extent that such expenses would be properly included in a cost of service rate regulated by the Federal Energy Regulatory Commission and are not Uncapped O&M Costs." This provision makes clear that the parties intended to evaluate this issue in the same way a FERC-regulated entity would do so. In other words, item (xviii) costs are recoverable under the Concession Agreement if they would be recoverable under relevant FERC regulations.

42.    Because compensation paid to UIEC's executives comprises costs that would be recoverable under FERC regulations, *see* 18 C.F.R. § 367.9200, these costs fall within Capped O&M Costs as well. This provides yet another reason these costs must be included in the calculation of the Utility Fee.

43.    For the same reason, certain of UIEC's administrative expenses (such as office supplies) and the Operator's corporate overhead (approximately $275,000 in the first year) fall within Capped O&M Costs because those costs would also be recoverable under FERC regulations. But here again, the University wrongfully refuses to include these costs in the Utility Fee.

44.    *Parent Guarantee.* As relevant here, Section 3.6 of the Concession Agreement requires that UIEC "shall have an investment grade credit rating, as determined by at least one of the Credit Rating Agencies." Section 3.6 of the Concession Agreement further provides that UIEC's "annual reasonable, actual-out-pocket cost of maintaining the credit rating of the

Leasehold Mortgage Debt with a Credit Rating Agency shall, for the first three Fiscal Years after the Closing be added to the Capped O&M Index . . . ." UIEC's Capped O&M Costs also include costs associated with maintaining its investment grade credit rating. Concession Agreement § 1.1 (definition of "Capped O&M Costs," item (xxiii)).

45.     In order to secure and maintain an investment grade credit rating from its ratings agency, UIEC needed the Operator to assume the significant contractual performance shortfall damage provisions under the Concession Agreement, and to obtain a guarantee of the Operator's obligations and liabilities from the Operator's ultimate parent company.

46.     The annual cost to UIEC of having the Operator provide that parent company guarantee is calculated pursuant to a formula and reflects an amount that was negotiated with the Operator at arm's length.  For fiscal year 2021, the cost of the parent company guarantee was approximately $260,104; for fiscal year 2022, the cost was approximately $368,429.   The University improperly refuses to factor this cost into the Capped O&M Costs component of the Utility Fee as well.

47.     UIEC has provided the University with detailed information and documentation backing up each of the cost categories outlined in paragraphs 1 through 47 above. Yet in the face of these clear contractual payment obligations, supported by ample evidence, the University refuses to pay.

### *The Casualty Events*

48.     The University's breaches are not limited to its repeated refusal to pay contractually required fees. In the summer of 2020, in the course of discharging its independent obligations under the Operations and Maintenance Agreement, the Operator identified two Utility System Components in need of immediate repair, and raised the matter with UIEC. UIEC and the Operator

then raised these items with the University. The University at first agreed to the repairs and to finance them, but when the components broke before the repairs could be completed (collectively, the "Casualty Events"), the University reneged on its promises.

49.     First, in September 2020, UIEC put forward a proposal it developed with the Operator to spend $2.5 million overhauling a turbine forming part of the Utility System as a Capital Improvement under Section 4.3 of the Concession Agreement. UIEC made this proposal because the turbine, which prior to UIEC assuming its role as concessionaire was the University's responsibility, was in bad repair as a result of the University's inadequate maintenance. The University accepted the proposal and agreed to fund the overhaul as an "Approved Capital Improvement."

50.     In or around November 2020, before the overhaul work had been started, that same turbine suffered an "overspeed event," where it was damaged due to the simultaneous failure of two separate control valves. The work and cost needed to repair the turbine has significantly increased in scope because of conditions that were not knowable at the time the initial approvals were secured.  To date, the University has not approved any change orders for the required scope changes even though the Operator has worked diligently to rectify all problems as they are identified.

51.     Second, in or around June 2020, the Operator identified a need for repair work on the roofs of the main power plant and domestic water production Utility System buildings due to age degradation and loss of water tight integrity. UIEC put forward a proposal it developed with the Operator to repair the roofs as a Capital Improvement under Section 4.3 of the Concession Agreement, and the University accepted the proposal and agreed to fund the repair as an "Approved Capital Improvement."

52.     Before the repair work began, however, the roofs were further damaged in the August 2020 derecho storm. The work needed to repair the damage to the roofs due to the storm is substantially similar in scope and cost to the work that the University had previously authorized as an Approved Capital Improvement.

53.     In mid-December 2020, the University changed its position, and informed UIEC that it was not going to pay for any of the required repair/overhaul for either of the two Casualty Events *or* make an insurance claim for the damage under its All Risks Property Policy. In other words, after approving a plan and costs to fix these issues, the University turned around and sought to reverse its approval.

54.     The University has no basis for reneging on its promise to pay for the required repair work. Nor does the University have any basis for its failure to seek insurance coverage: It claims that it is not required to seek coverage because the value of the claim is below the policy's deductible, but nowhere does the Concession Agreement provide that the University can decline to seek coverage on such a basis. To the contrary, it is standard market practice for an insured to submit an insurance claim as a protective measure even if the amount of the expected loss is lower than the deductible.

55.     UIEC was not responsible for the Casualty Events. The Concession Agreement does not contemplate that UIEC would have to fund repair costs arising from casualty events of this nature, but UIEC has had to bear such costs in these instances.

56.     The Concession Agreement also does not allow the University to revoke its approval of Approved Capital Improvements, *see* Concession Agreement § 7.2(b), or to decline to seek insurance coverage unreasonably.

57.     The University must therefore either deem the cost of the repairs as New Approved Capital Improvement Costs under Section 4.3(e) and Schedule 5 of the Concession Agreement, or seek insurance coverage for the repairs under Section 13.4(b) of the Concession Agreement. But in direct breach of the Concession Agreement, the University has done neither.

### *UIEC's Limited Obligations for Insurance Deductible*

58.     In addition to the foregoing, with respect to the University's All Risk Property Insurance for the Utility System, UIEC is only responsible for the first $250,000 of any deductible. Concession Agreement § 1.1 (definition of "Uncapped O&M Costs", item 1(p)). The University has taken the position that this limitation on UIEC's liability only applies if the University chooses to file a claim for insurance coverage. The University is incorrect.

59.     The cap on UIEC's liability for deductible costs was specifically negotiated to address circumstances like those that have arisen here. The parties never intended for UIEC to bear the full risk of costs up to the University's deductible without any reimbursement, as that would have created an unmeasurable risk over the 50-year concession period, and such a risk, in turn, would have prevented UIEC from obtaining financing for and closing on the P3 deal.

60.     The Concession Agreement was therefore designed to protect UIEC from costs in excess of the $250,000 deductible cap when a property damage event that is covered by the policy occurs, regardless of whether the University seeks coverage. As a result, while UIEC should not be responsible for any of the costs associated with addressing the Casualty Events, to the extent that UIEC is found to be responsible for such costs in the future, its liability should be capped at $250,000, with the University responsible for any balance.

### Operator Margin

61.     The University has also disputed UIEC's right to include any Operator margin (e.g.,
amounts payable for construction management services) within the costs it is entitled to include in
budgets for Capital Improvements and to recover in connection with any Capital Improvements
that are approved. These costs arise from the Operations and Maintenance Agreement between
UIEC and the Operator, which is a separate, independently negotiated contract that the University
was well aware of when it signed on to the Concession Agreement.

62.     The University apparently believes the Operator should perform its work with no
margin, i.e., for free. This position is untenable and contradicted by common sense. No rational
operator in the market would perform work without charging a margin to cover its costs. The
University's position is also flatly contradicted by Section 4.3(c)(2)(H) of the Concession
Agreement, which allows UIEC to include "any fee or charge payable to the Operator in
connection with such Capital Improvement" when it submits a Five-Year Plan with proposed
Capital Improvements to the University.

### The University's Claims for Key Performance Indicator Compensation

63.     In addition to its breaches, the University has also advanced unsupportable claims
against UIEC and threatened UIEC with litigation relating to them. For each of these claims, the
University alleges, without merit, that it is entitled to potential Key Performance Indicator ("KPI")
Compensation under the Concession Agreement due to alleged unplanned utility outages.

64.     *The Chilled Water Outage.* On June 2, 2021, the University sent UIEC an untimely
notice of dispute claiming that a chilled water outage was an "Unplanned Outage" entitling the
University to $5,000,000 in KPI Compensation under the Concession Agreement.

65.     The problem for the University is that its claim does not square with the facts. The chilled water outage, which occurred in March and April of 2021, was a planned outage under Section 3.2(g) of the Concession Agreement. The parties discussed the outage repeatedly before it happened, beginning as far back to December 2020. UIEC put the University on actual notice, in writing, of the outage, and the parties actively coordinated and prepared for the outage for months.

66.     In fact, discussions about the outage took place with a number of representatives (including management) of the University between December 2020 and April 2021. The particulars of the outage were also discussed in detail at a March 23, 2021, North Campus Chiller Project site logistics meeting attended by seven representatives of the University.

67.     Against that backdrop, the University's claim that the outage was "unplanned" does not withstand scrutiny. The University is not entitled to KPI Compensation on the basis of a supposed "unplanned" chilled water outage or on any other basis.

68.     Even if the outage did qualify for KPI Compensation—which it does not—the University's claim would still fail for lack of notice. Under Section 15.2 of the Concession Agreement, the University is required to provide notice of any KPI Event within 30 Days following the date on which the University first "became aware" of the KPI Event, with time being of the essence, *id.* § 20.15. The University was aware of the planned outage of the chilled water system as early as December 18, 2020 and was informed of the actual outage in March and April 2021. The University did not send its notice of dispute to UIEC until June 2, 2021—several months too late.

69.     *The Spence Labs Outage.* On November 19, 2021, the University sent UIEC notice of an alleged Performance Standards Failure in relation to the upgrade of the electrical systems at

Spence Labs, which houses research laboratories and faculty offices for the University's Department of Psychology.

70.     During the work to upgrade the systems, there was an outage of electrical service. In its November 19, 2021 notice, the University alleged the electrical outage was unplanned, extended beyond permissible limits, and therefore constituted a Repetitive Performance Standards Failure under the Concession Agreement. But like the chilled water outage, the Spence Labs outage was planned. The planning efforts involved multiple meetings between the Operator and the University, and are well documented in the correspondence between them. The outage occurred, as planned, on October 30, 2021, and the Operator received acknowledgment from a University employee that there were no reported issues. Yet the University now claims, without basis, that UIEC (through the Operator) failed to comply with Performance Standards in connection with the outage.

71.     Due to the University's threats of litigation concerning each of these outage events, UIEC seeks declaratory relief through this action to put an end to the University's threats.

***UIEC Has Satisfied Applicable Pre-Litigation Requirements***

72.     To the extent the claims asserted in this action are "Pass-Through Claims" within the meaning of the Operations and Maintenance Agreement between UIEC and its Operator, they are asserted by UIEC on behalf and pursuant to the instructions of the Operator.

73.     Before UIEC filed this action, the parties engaged in the dispute resolution procedures and satisfied the requirements set forth in Sections 18.2 and 18.3 of the Concession Agreement, but the parties were unable to resolve their disputes.

## CAUSES OF ACTION

### First Cause of Action
### Breach of the Concession Agreement: The Utility Fee

74.     UIEC incorporates by reference and repeats and realleges paragraphs 1 through 73 as if fully set forth herein.

75.     UIEC has discharged its obligations under the Concession Agreement.

76.     The Concession Agreement requires the University to pay an annual Utility Fee, which is comprised in part of the Capped O&M Index. The Capped O&M Index, in turn, is essentially a rolling three-year average of UIEC's Capped O&M Costs.

77.     UIEC's Capped O&M Costs include, among other components:

a.      The $1.5 million annual fee that UIEC must pay to the Operator under the Operations and Maintenance Agreement between UIEC and the Operator;

b.      The compensation packages payable to UIEC's CEO and CFO;

c.      UIEC's administrative costs and the Operator's corporate overhead; and

d.      The cost to UIEC of maintaining its investment grade credit rating.

78.     The University's refusal to include the costs identified in the preceding paragraph in the calculation of the Utility Fee, and to pay a Utility Fee reflective of them, is in breach of Sections 3.1(a), 3.6 and 7.1, and Schedule 5, of the Concession Agreement.

79.     As a result of the University's breach of Sections 3.1(a), 3.6 and 7.1, and Schedule 5, of the Concession Agreement, UIEC has been damaged in an amount to be proven at trial.

### Second Cause of Action
### Declaratory Judgment:  The Utility Fee

80.     UIEC incorporates by reference and repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81.    UIEC has discharged its obligations under the Concession Agreement.

82.    Under the Concession Agreement, UIEC is entitled to have all the Operator's reasonable fees and margins factored into the Utility Fee.

83.    As a result of the University's failure to properly calculate the Utility Fee, there is an actual and justiciable controversy of sufficient immediacy between the parties, which have adverse legal interests, to warrant declaratory judgment.

84.    By reason of the foregoing, UIEC requests, under 28 U.S.C. § 2201(a), that the Court adjudge, declare, and decree that the University must factor all the Operator's reasonable fees and margins into the Utility Fee in accordance with the Concession Agreement.

**Third Cause of Action**
**Breach of the Concession Agreement: The Casualty Events**

85.    UIEC incorporates by reference and repeats and realleges paragraphs 1 through 73 as if fully set forth herein.

86.    UIEC has discharged its obligations under the Concession Agreement.

87.    Under the Concession Agreement, the University cannot revoke its approval of Approved Capital Improvements, yet the University has done so with respect to the Approved Capital Improvements associated with the Casualty Events. As a result, the University is in breach of Sections 3.1(a), 4.3(e), and Schedule 5, of the Concession Agreement.

88.    As a result of the University's breach of Sections 3.1(a), 4.3(e), and Schedule 5, of the Concession Agreement, UIEC has been damaged in an amount to be proven at trial.

**Fourth Cause of Action**
**Declaratory Judgment: The Casualty Events**

89.    UIEC incorporates by reference and repeats and realleges paragraphs 1 through 73 as if fully set forth herein.

90.     The University's attempt to revoke its approval of Approved Capital Improvements for the work needed to address the Casualty Events is not permitted by the Concession Agreement. In addition, the Concession Agreement requires the University to file a claim for insurance coverage to cover the costs associated with the Casualty Events, Concession Agreement § 13.4(b), and caps UIEC's liability for any deductible associated with such coverage at $250,000, *id.* § 1.1 (definition of "Uncapped O&M Costs", item 1(p)).

91.     As a result of the University's unlawful revocation of its approval of Approved Capital Improvements and its refusal to seek insurance coverage for the Casualty Events as required by the Concession Agreement, there is an actual and justiciable controversy of sufficient immediacy between the parties, which have adverse legal interests, to warrant declaratory judgment.

92.     By reason of the foregoing, UIEC requests, under 28 U.S.C. § 2201(a), that the Court adjudge, declare, and decree that: (i) the University is not entitled to revoke its approval of Approved Capital Improvements; (ii) the Approved Capital Improvements associated with the Casualty Events remain valid; (iii) Section 13.4(b) of the Concession Agreement requires the University to submit a claim for insurance coverage in connection with the Casualty Events; and (iv) UIEC's liability for any costs associated with the Casualty Events is capped at a total of $250,000, regardless of whether the University submits a claim for insurance coverage.

**Fifth Cause of Action**
**Declaratory Judgment: Operator Margin**

93.     UIEC incorporates by reference and repeats and realleges paragraphs 1 through 73 as if fully set forth herein.

94.     As a result of the University's refusal to allow UIEC to include Operator margin within the costs it is entitled to include in budgets for Capital Improvements, there is an actual and

justiciable controversy of sufficient immediacy between the parties, which have adverse legal interests, to warrant declaratory judgment.

95.     By reason of the foregoing, UIEC requests, under 28 U.S.C. § 2201(a), that the Court adjudge, declare, and decree that UIEC is entitled to include reasonable Operator margin in budgets for Capital Improvements and to recover those costs in connection with any Capital Improvements that are approved.

**Sixth Cause of Action**
**Declaratory Judgment: The University's Claims for KPI Compensation**

96.     UIEC incorporates by reference and repeats and realleges paragraphs 1 through 73 as if fully set forth herein.

97.     As a result of the University's baseless attempt to extract KPI Compensation from UIEC, there is an actual and justiciable controversy of sufficient immediacy between the parties, which have adverse legal interests, to warrant declaratory judgment.

98.     By reason of the foregoing, UIEC requests, under 28 U.S.C. § 2201(a), that the Court adjudge, declare, and decree that neither the chilled water outage nor the Spence Labs outage gave rise to KPI Events and/or Performance Standards Failures.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff UIEC prays for judgment as follows:

1.     Awarding UIEC compensatory damages for the University's breaches of the Concession Agreement, in an amount to be proven at trial;

2.     Adjudging, decreeing, and declaring that the University must factor all the Operator's reasonable fees and margins into the Utility Fee in accordance with the Concession Agreement;

3.      Adjudging, decreeing, and declaring that the University is not entitled to revoke its approval of Approved Capital Improvements;

4.      Adjudging, decreeing, and declaring that the Approved Capital Improvements associated with the Casualty Events remain valid;

5.      Adjudging, decreeing, and declaring that Section 13.4(b) of the Concession Agreement requires the University to submit a claim for insurance coverage in connection with the Casualty Events;

6.      Adjudging, decreeing, and declaring that UIEC's liability for any costs associated with the Casualty Events is capped at a total of $250,000, regardless of whether the University submits a claim for insurance coverage;

7.      Adjudging, decreeing, and declaring that UIEC is entitled to include Operator margin in budgets for Capital Improvements and to recover those costs in connection with any Capital Improvements that are approved;

8.      Adjudging, decreeing, and declaring that neither the chilled water outage nor the Spence Labs outage gave rise to KPI Events or Performance Standards Failures under the Concession Agreement;

9.      Awarding UIEC its reasonable attorneys' fees, costs, and other expenses associated with this action under Section 12.2 of the Concession Agreement; and

10.     Granting UIEC such other and further relief as the Court deems just and proper.

THE WEINHARDT LAW FIRM


By /s/ Mark E. Weinhardt
    Mark E. Weinhardt                    AT0008280
    2600 Grand Avenue, Suite 450
    Des Moines, IA  50312

Telephone:  (515) 244-3100
E-mail:  mweinhardt@weinhardtlaw.com

Bradley S. Pensyl (*pro hac vice pending*)
Justin L. Ormand (*pro hac vice pending*)
Allen & Overy LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 610-6300
E-mail:  bradley.pensyl@allenovery.com

ATTORNEYS FOR PLAINTIFF